RHODE ISLAND HOSPITAL TRUST CO. v. COMMISSIONER OF INTERNAL REVENUE.

Circuit Court of Appeals, First Circuit. November 27, 1928.

No. 2260.

340

Ferdinand Tannenbaum, of New York City (William R. Tillinghast, Harold B. Tanner, and Tillinghast & Collins, all of Providence, R. I., on the brief), for petitioner.

John Vaughan Croner, Sp. Asst. Atty. Gen. (Mabel Walker Willebrandt, Asst. Atty. Gen., C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, V. J. Heffernan and Clark T. Brown, Sp. Attys., Bureau of Internal Revenue, all of Washington, D. C., and Sewall Key, Sp. Asst. Atty. Gen., on the brief), for the Commissioner.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. This is a petition for the review of a decision of the Board of Tax Appeals, redetermining a deficiency profits tax of the petitioner for the fiscal year ended October 31, 1921. The Commissioner on August 12, 1925, held the petitioner liable for an additional tax of $67,916.46. On appeal to the Board of Tax Appeals, this deficiency tax was reduced to $59,085.45.

The questions now presented arise under the deduction provisions of the Revenue Act of November 23, 1921, 42 Stat. 227, 254, § 234 (a):

"That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:
* * *

"(4) Losses sustained during the taxable year and not compensated for by insurance or otherwise; * * *

"(5) Debts ascertained to be worthless and charged off within the taxable year (or in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts); and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt to be charged off in part."

Pertinent provisions of Treasury Regulation 62 (of 1922) are as follows:

"Art. 151. *Bad debts.*—Bad debts may be treated in either of two ways—(1) by a deduction from income in respect of debts ascertained to be worthless in whole or in part or (2) by a deduction from income of an addition to a reserve for bad debts. For the year 1921 taxpayers may, regardless of their previous practice, elect either of these two methods and will be required to continue the use in later years of the method so elected unless permission to change to the other method is granted by the Commissioner.
* * * * * * *

"Art. 155. *Reserve for Bad Debts.*—Taxpayers who have, prior to 1921, maintained reserve accounts for bad debts may deduct a reasonable addition to such reserves in lieu of a deduction for specific bad-debt items. Taxpayers who have not heretofore maintained such reserve accounts may now elect to do so, and in such case shall proceed to determine the amount of the reserve that should reasonably have been set up as at December 31, 1920, (which shall not be deducted in computing net income), and in respect of 1921 and subsequent years may add a reasonable addition to such reserve and deduct the amount in computing taxable net income. Where a reserve account is maintained, debts ascertained after December 31, 1920, to be worthless in whole or in part, (a) if such debts were outstanding at December 31, 1920, should be charged against the reserve and may be deducted from income, in accordance with article 151; (b) if such debts arose after December 31, 1920, should be charged against the reserve, and not deducted from income. What constitutes a reasonable addition to a reserve for bad debts must be determined in the light of the facts, and will vary as between classes of business and with conditions of business prosperity. A taxpayer using the reserve method should make a statement in his return showing the volume of his charge sales (or other business trans-

actions) for the year and the percentage of the reserve to such amount, the total amount of notes and accounts receivable at the beginning and close of the taxable year, and the amount of the debts which have been ascertained to be wholly or partially worthless and charged against the reserve account during the taxable year."

The real issues were unnecessarily confused by both sides in the proceedings before the Commissioner and before the Board of Tax Appeals. The trust company originally sought a deduction for bad debts and also an addition to its reserve for bad debts. The tax authorities correctly ruled that the taxpayer was not entitled to both. This petitioner's counsel now concedes. But he contends that the same result should have been reached by making equivalent additions to the reserve; that the evidence required such additions, and that the Commissioner and the Board of Tax Appeals erred in two essential respects: (1) In failure to deal with the matter at all as a matter of discretion; (2) in ruling that the evidence did not, as matter of law, warrant the exercise of discretion in the taxpayer's favor.

The petitioner is a large trust company in Providence, R. I. On October 31, 1921, it had outstanding over $51,000,000 in accounts receivable, loans, notes, mortgages, etc. Of these about $23,000,000 was in short-time notes, practically all contracted during that year. It had previously established a reserve of $1,000,000 to cover bad debts. In the tax year ended October 31, 1921, it sought to charge an addition of $200,000 to this reserve because of special conditions (described below) and also to charge off $87,500 as a prospective loss incurred through the purchase (at a cost of $98,000) in 1915 of $100,000 par of the Massachusetts Electric Company's 5 per cent. notes, due April 19, 1918. The Commissioner disallowed both of these deductions.

In behalf of the respondent it is contended that the Commissioner exercised his discretion against the taxpayer's claim, and that that discretion is not reviewable by this court, but is reviewable by the Board of Tax Appeals. Blair v. Oesterlein Mach. Co., 275 U. S. 220, 48 S. Ct. 87, 72 L. Ed. 249; Williamsport Wire Co. v. United States, 48 S. Ct. 587, 72 L. Ed. 985. For present purposes, we assume that, if the Commissioner and the Board of Tax Appeals exercised their discretion, on legal and reasonable grounds, this court could not substitute its discretionary judgment for that of the tax authorities. But if there was failure really to exercise discretion, or error of law in its exercise, then the court must grant relief. Federal Trade Commission v. Pacific Paper Association, 273 U. S. 52, 63, 47 S. Ct. 255, 71 L. Ed. 534; Silberschein v. United States, 266 U. S. 221, 225, 45 S. Ct. 69, 69 L. Ed. 256. Compare Holmes & Brewster's Federal Tax Appeals, p. 432.

As already stated, it is now conceded that the tax authorities were correct in ruling that the trust company was not entitled both to deduct the $87,500 above referred to as a bad debt, and also to make an addition of $200,000 to its reserve; but it does not follow that the tax authorities should not have added the $87,500 to the proposed addition to the reserve. Taxpayers' rights are not, under the conditions here involved, to be determined on merely technical grounds. The provision for this reserve first appeared in this act of 1921. The trust company's real rights were not to be destroyed because of its initial failure to put its claim on the technically proper ground, under this new provision.

Neither the Commissioner nor the Board of Tax Appeals dealt with the real questions. While the opinion of the Board is not entirely clear, apparently it affirmed the Commissioner's rejection of this claimed deduction of $87,500 merely because the taxpayer had also claimed a $200,000 addition to its reserve, not as disallowable as matter of discretion. It disposed of the claim for an addition to the reserve in the following summary fashion:

"The evidence adduced shows that in setting up its reserve for bad debts and in making additions thereto the petitioner apparently resorted to guesswork. There is no evidence with respect to its experience as to losses over a period of years, upon which a reasonable reserve might be predicated."

This ruling cannot be sustained. It disregards the obviously sound and controlling principle stated in article 155 of the Regulations, supra:

"What constitutes a reasonable addition to a reserve for bad debts must be determined in the light of the facts, and will vary as between classes of business and with conditions of business prosperity."

We turn now to the evidence showing the grounds upon which the bank officials acted. Its president testified as follows:

"It was the policy of the company in and prior to the fiscal year ending October 31, 1921, to set aside a reserve for anticipated bad debts. This reserve was maintained under my direction, and had been maintained

since October 31, 1919. On October 31, 1919, the reserve was $600,000.

"The basis of the existence of the policy of maintaining a reserve was experience with losses during the year. The reserve was called a 'reserve for depreciation,' and was to take care of short-time notes and industrial loans.

"By order of the executive committee, on my recommendation, there was added to the reserve for the fiscal year ending October 31, 1921, $200,000. Half of this amount was set up in April at the end of six months of the year, and the other half at the end of the other six months of the year.

"The basis of the recommendation of the addition to the reserve fund for bad debts was because business at that time was in a very precarious condition. It was anticipated that heavy losses might be sustained. People who would ordinarily go out of debt once or twice a year did not do it. All banks had frozen loans at that time, and the Rhode Island Hospital Trust Company was very anxious about it.

"I do not know how we fixed on the figure of $200,000. The company had about $23,-000,000 in short-time notes at that time, practically all of which were contracted during the year, and we thought $200,000 was a reasonable amount to set up for the reserve. The amount was based on the experience in the past, and particularly on the observation of conditions at that time.

"The general conditions, especially in New England, were very bad. Textiles are a very large part of the business of the company. The textile business was very bad. Almost all the cotton mills and textile mills had overbuilt during the war. Business dropped off. Some paid off too much money in dividends, spent too much money in their plants, and there was a frozen condition. The mills could not collect the receivables themselves, and they could not pay the banks. The banks through the whole country practically carried business along for quite a period. If they had not, there would have been some very bad business, and as it was, a good many of the weaker mills failed, and it was a rather anxious time for banks.

"The outlook at the time when the addition to the reserve for the fiscal year 1921 was ordered, justified the sum of $200,000 as a reasonable figure.

"In 1920 the bank set up $400,000 to the reserve, and in 1919 the bank had [added] $200,000. There was no amount added to the reserve in 1922 or 1923. Conditions changed materially about that time. The $200,000 [400,000] added in 1920 * * * was not an unusual amount up to that time. It was smaller than it had been in some other years. A reserve for depreciation is carried in the sum of $550,000 at the present time."

 It is probably a matter of general knowledge and within the judicial cognizance of this court—at any rate this evidence shows clearly—that in the fall of 1921 banks faced very dangerous conditions calling for extraordinary precautions in order to secure themselves against failure, with resultant serious injury to widespread public interests. The stated grounds for the action of the executive officials of this bank in increasing their reserve for bad debts—and thus decreasing the showing of profits applicable to dividends—is highly persuasive, if not entirely conclusive. To characterize this clear and cogent statement of the grounds on which experienced bankers limited their profits in the interest of safety, as "guesswork," because reasonably anticipated losses were not ascertainable by mathematical calculation, is a position which this court declines to adopt. There is in this record no atmosphere of tax-dodging. While the honest judgment of bank officials as to the amount of profits made does not appear to be expressly made by statute prima facie evidence for profits-tax purposes, it is certainly, in the absence of any indication of a tax-dodging intent, to be given very substantial, if not controlling, weight. Plainly, such conservative action by officials, having obviously fully adequate motives to regard loans made by themselves as good, should not be lightly overruled by any governmental authorities. To hold, as the Board of Tax Appeals apparently did hold, that the evidence did not warrant the Commissioner in exercising discretion favorable to the bank's claim, because there was "no evidence with respect to its experience as to losses over a period of years upon which a reasonable reserve might be predicated," was, as matter of law, wrong. Very few, if any, banks would, in the fall of 1921, have acted wisely if they had taken the "experience as to losses over a period of years" as then a basis for a reserve for bad debts. Unusual conditions call for unusual measures. The Board of Tax Appeals in effect ruled that the unusual conditions of 1920–21 should be disregarded, and that this bank was entitled to make no increase in its reserve except on the basis of experience as to losses over a period of years. That was plainly error.

As to the claim of $87,500, the evidence —which is lengthy and need not be detailed —shows plainly that at that time the bank was fully warranted in considering its original investment of $98,000 as worth no more than $10,500. The fact that the Massachusetts Electric Company notes, through the reorganization under the federal court receivership and the Massachusetts special act of 1918 (chapter 188), ultimately (but unexpectedly) liquidated for $41,749.52 in 1925 (apparently without interest for several years) has no controlling weight over the persuasive evidence that in 1921 this investment was mostly lost. It was not a case of mere "fluctuation in the market value," as the Board of Tax Appeals seems to have regarded it; it was a salvage from a security in 1921 fairly deemed almost dead. But the petition and the findings of fact set out that, of this investment of $98,000, $48,000 was written off in 1918, and $25,000 in 1919, and $14,500 in 1921. Under these conditions we fail to see how the first two of these same sums can be charged off as bad debts in 1921. Avery v. Com. of Int. Rev. (C. C. A.) 22 F.(2d) 6, 7, 55 A. L. R. 1277. It is enough now to say that the claim was not properly disposed of by the Commissioner and the Board of Tax Appeals, and that it should have been considered under the Commissioner's discretion as to the amount the trust company should be permitted to add to its reserve. It was not so considered.

The general result is that the case must be remanded for rehearing under section 1003 (6) of the Act of 1926 (chapter 27, 44 Stat. 110 [26 USCA § 1226]), with instructions to consider, legally and reasonably, in the light of the facts, the claimed deductions from income of the items making up the $87,500 and of $200,000 as additions to the reserve, allowable, in whole or in part, as such, in the sound discretion of the tax authorities.

The Commissioner allowed $100,000 for bad debts—not now in controversy. But, as the petitioner had "heretofore maintained such reserve" (cf. article 155, supra), technically this deduction should, as matter of correct form, have been charged as an addition to the reserve—making the entire claim, when properly allocated, an increase of $387,500 to the reserve.

The order of redetermination of the Board of Tax Appeals is vacated and the case is remanded to said Board of Tax Appeals for further proceedings not inconsistent with this opinion.