**WINTER GARDEN PRODUCTION CREDIT ASSOCIATION,**
Plaintiff,

v.

**R. L. PHINNEY, Director of Internal Revenue, Defendant.**

**RICHMOND PRODUCTION CREDIT ASSOCIATION, Plaintiff,**

v.

**UNITED STATES of America,**
Defendant (two cases).

**Civ. A. Nos. 7973, 7974, 8512.**

United States District Court
S. D. Texas, Houston Division.
Nov. 21, 1955.

Liddell, Austin, Dawson & Huggins, Paul Port, Houston, Tex., for plaintiffs.

H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe and Carrington Williams, Washington, D. C., and Malcolm R. Wilkey, U. S. Atty., and Carlos G. Watson, Jr., Asst. U. S. Atty., Houston, Tex., for defendants.

CONNALLY, District Judge.

The three above-styled actions were consolidated for trial. Each is an action for recovery of income taxes allegedly erroneously collected. Richmond Production Credit Association is the taxpayer in C.A. 7974 and C.A. 8512. In the former, recovery is sought of $9,972.51 paid as tax deficiencies for the fiscal years ending November 30, 1948, and November 30, 1949. In the latter, recovery is sought of $26,375.17 as deficiencies for the fiscal years ending November 30 of 1950, of 1951, and of 1952. Winter Garden Production Credit Association is the taxpayer in C.A. 7973, wherein recovery is sought of $23,024.53 as deficiencies for calendar 1948 and two fiscal periods from January 1, 1949, to June 30, 1950.

The sole question for determination concerns the proper reserve for bad debts of the taxpayers, and the deductions claimed for this purpose.

Richmond Production Credit Association ("Richmond" hereafter) is an association of farmers organized in January 1934, under the provisions of the Farm Credit Act of 1933 (12 U.S.C.A. § 1131 et seq.) for the purpose of making loans to farmers and livestock owners in several Texas counties in the vicinity of Houston. Pursuant to the statute in question, the original capital was invested by Production Credit Corporation of Houston with the stock of Richmond owned by such corporation. By January 1, 1948, all of the stock held by Production Credit Corporation was retired, and from that time forward, pursuant to the pertinent statutory provisions, Richmond for the first time became subject to the payment of income tax.

By reason of the farm economy within the region of Richmond's operations, approximately 88% of its loans are made to farmers to finance their production of

rice or livestock, or a combination of the two. The loans usually are collateralized by farm machinery and/or livestock.

Winter Garden Production Credit Association ("Winter Garden" hereafter) was organized in December, 1933, under substantially the same conditions as was Richmond. It operates, however, in the so-called Winter Garden area of Texas, being the extremely southern portion of central Texas where there is little irrigation and where livestock, cotton, and vegetables are the principal farm products. The Production Credit Corporation's stock ownership in Winter Garden was retired in 1947. Hence, it likewise became subject to income tax for the first time in 1948.

Pursuant to the mandate of the Act (§ 1131f of Title 12, U.S.C.A.), the Production Credit Corporation prescribed the amount of the reserve account for bad and doubtful debts to be set aside by Richmond and Winter Garden. For Richmond, it fixed a reserve of 1% of loans outstanding at the end of each year, with a ceiling of 5% of the amount of such loans. For Winter Garden, the corporation prescribed a rate of 1.2% of outstanding loans at the end of each year, with a ceiling of 6% of such outstanding loans. Whether this determination of the proper reserves be considered a "recommendation" or a "directive", in each instance it was adopted by the Board of Directors of the taxpayer.

On review of these figures, the Commissioner of Internal Revenue, acting under § 23(k) of Title 26, U.S.C.A., disagreed, and in the exercise of his statutory discretion fixed a rate of .17% with a ceiling of .51% for each.

Taxpayers contend first that the rate fixed by Production Credit Corporation, pursuant to its statutory authority, is binding as a matter of law upon all other governmental agencies, and may not be questioned here by the Commissioner. Taxpayers point to the fact that the twelve Production Credit Corporations created under the Act, including the

Production Credit Corporation of Houston, as well as the various Associations created pursuant thereto, including the two taxpayers here, are "fiscal agents" of the United States and are deemed to be "instrumentalities of the United States". They point further to the initial use of Government funds, to the statutory stock ownership plan, and to their early tax exemption as showing their close governmental affinity. Taxpayers further contend that if the rate adopted be not binding on the Commissioner as a matter of law, then as a matter of fact, under all of the facts and circumstances prevailing, the rates adopted are reasonable and proper; while the rate fixed by the Commissioner is so inadequate and unreasonable as to constitute an abuse of his discretion.

The Government, of course, contends to the contrary. It is urged that the rate of reserve determined by the Commissioner, in the exercise of the discretion vested in him by § 23(k) (1) of Title 26, is entitled to great weight and should not be disturbed in the absence of strong evidence that the discretion was abused; and secondly, that the Commissioner's determination of a proper rate is a reasonable one.

The evidence consisted in large part of testimony of plaintiffs' officers and others with knowledge of this type business. The hazards and uncertainties of the farmer in the two areas in question were described at length. It was shown that the Production Credit Corporation had fixed rates in various sections of the State, ranging from .5% per year to 1.2% per year.

The loss history of each of the taxpayers involved, as well as that of rural banks and of other agricultural credit corporations likewise was received. This may be summarized briefly as follows. Neither taxpayer here had suffered any bad debt losses of any consequence from the time of organization (about January, 1934) to 1952. The eighteen agricultural credit corporations whose business was considered so similar to that of

the plaintiff taxpayers that their bad debt loss history was charted and received in evidence by agreement showed substantial losses in 1931 and 1932 (1.53% and 2.01%). Severe losses were sustained in 1933 (4.1%), with conditions improving regularly thereafter through the late 1930's. During the 1940's, the bad debt losses were negligible.

The fact that the two taxpayers showed no significant bad debt loss during the middle 1930's, as did the other lending institutions whose history was received for comparative purposes, appears due to the fact that the loss sustained by the other agencies during those years stemmed from earlier commitments made during better economic conditions. As the maturities fell during depression days, substantial losses were incurred. But the two plaintiff taxpayers were organized about January, 1934. Loans made thereafter matured during more favorable economic conditions, and hence reflected no serious bad debt losses.

With respect to Winter Garden, however, recent evidence shows a very different picture. During the years 1953, 1954, and early 1955, the Winter Garden area of Texas suffered a severe and prolonged drouth of unprecedented proportions. Bad debt losses of such severity were sustained by Winter Garden as to exhaust its complete reserve for bad debts, and to require Production Credit Corporation to advance $250,000 of additional capital. During the fiscal year ending June 30, 1954 (by far the worst), Winter Garden charged off just under $300,000 in bad debts compared to outstanding loans of just under $3,500,000. Plaintiffs argue that in their determination of a proper reserve figure they could not, of course, foresee with certainty or definiteness the drouth which Winter Garden suffered in the early 1950's; but they contend it is such contingencies with the resultant heavy losses against which the reserve is designed to afford protection. They point out that throughout the State of Texas the reserves fixed by Production Credit Corporation vary depending upon the situations and circumstances peculiar to each area; that their figures were arrived at after expert study by those with long professional experience in the farm credit field.

The reserve determined upon by the Commissioner admittedly results purely from arithmetical calculation. The average ratio of losses to loans sustained by all of the production credit associations in Texas from 1934 to 1949 was calculated, giving a figure of .17%. This was adopted by the Commissioner as the correct annual figure. He then allowed as a ceiling .51%, or an accumulation of three years' deduction. It will be noted the taxpayers calculated the ceiling at five times the annual deduction. The Government argues that the best evidence of losses to be sustained in the future is a showing of the losses sustained in the past, and suggests that the adoption by the Commissioner of such an arithmetical computation of taxpayers' past history does not constitute an abuse of his discretion.

 The determination by Production Credit Corporation of what that concern considers an appropriate reserve for bad debt figure, be it a recommendation or directive, does not in my judgment fix the figure as a matter of law, or preclude a review thereof by the Internal Revenue Service. When the associations become subject to income tax by the retirement of the Government-held stock, as did Richmond and Winter Garden in 1948, their bookkeeping, accounting and other such procedures are subject to review as are those of other taxpayers; and unduly favorable procedures may be disregarded by the Commissioner.

 That being true, the question remains as to whether the Commissioner abused his discretion and, if so, to what extent. I am convinced that he did, and that the rate which the Commissioner determined is unduly low and unrealistic.

I am convinced that this is so because the Commissioner's calculation does not take into account the highly significant fact that capable farm credit agencies suffered severe bad debt losses during the early 1930's; and the taxpayers here escaped this fate by reason of the fact that they were organized during the height of the depression days and that, with negligible exception, the farmers economic condition has prospered and improved during the taxpayers' entire history.

■ The wisdom and justification for reserves far in excess of those permitted under the Commissioner's ruling are graphically depicted by Winter Garden's experiences in 1953–1955. It is urged that evidence thereof should not have been received for the reason that those facts had not transpired at the time of the tax years in question and at the time of the Commissioner's determination; and that only prior history may be looked to in anticipating what the future bad debt losses of taxpayer might be. But I do not consider that the Court need close its eyes to facts which to all others are now apparent; and in determining the weight to be given to prophecies made in 1948, I am of the view that the Court may consider whether same may have been borne out to any extent by subsequent events.

The disasters which the farmer and rancher suffered in the early 1930's and in some areas in 1951–3, may again be visited upon him to some degree in the future. A recurrence of such conditions, of course, would occasion heavy bad debt losses to each of the taxpayers here. In my judgment, the rate of reserves for bad debts which each has set up is reasonable under the facts and circumstances existing.

The plaintiff in each instance is entitled to recover the alleged deficiencies which it heretofore has paid, with interest as prayed for.

The foregoing is adopted as Findings of Fact and Conclusions of Law.

Clerk will notify counsel.