MITCHELL–HURON PRODUCTION CREDIT ASSOCIATION, Plaintiff,

v.

W. C. WELSH, District Director of Internal Revenue, Defendant.

NORTHWEST–SOUTH DAKOTA PRODUCTION CREDIT ASSOCIATION, Plaintiff,

v.

W. C. WELSH, District Director of Internal Revenue, Defendant.

PIERRE PRODUCTION CREDIT ASSOCIATION, Plaintiff,

v.

W. C. WELSH, District Director of Internal Revenue, Defendant.

RAPID CITY PRODUCTION CREDIT ASSOCIATION, Plaintiff,

v.

W. C. WELSH, District Director of Internal Revenue, Defendant.

WINNER PRODUCTION CREDIT ASSOCIATION, Plaintiff,

v.

W. C. WELSH, District Director of Internal Revenue, Defendant.

WATERTOWN PRODUCTION CREDIT ASSOCIATION, Plaintiff,

v.

W. C. WELSH, District Director of Internal Revenue, Defendant.

YANKTON PRODUCTION CREDIT ASSOCIATION, Plaintiff,

v.

W. C. WELSH, District Director of Internal Revenue, Defendant.

ABERDEEN PRODUCTION CREDIT ASSOCIATION, Plaintiff,

v.

W. C. WELSH, District Director of Internal Revenue, Defendant.

Nos. 1100, 1101, 1102, 1103, 1104, 1105, 1106, 1107.

United States District Court
D. South Dakota, S. D.
July 2, 1958.

P. J. Coffey, Minneapolis, Minn., and John P. McQuillen, Sioux Falls, S. D., for plaintiffs.

Lyle E. Cheever, Asst. U. S. Atty., Sioux Falls, S. D., and Thomas H. Foye, Dept. of Justice, Washington, D. C., for defendants.

BECK, District Judge.

The plaintiffs in these eight cases, consolidated for trial, are Production Credit Associations organized in 1934 under the Farm Credit Act of 1933, with combined operating areas covering most of the State of South Dakota. Their functions are to make loans to farmers for agricultural purposes. Local operations are in control of boards of directors composed of farmer-members selected to serve. Their rights and powers are those inherent as a matter of general law, others delegated by federal statutes, treasury regulations and others prescribed by the federal supervising agency, the Production Credit Corporation of Omaha.

These suits arise out of differences between the total amounts claimed by the plaintiffs as reserve for bad debts for the years 1951, 1952, 1953 and 1954 and the amounts allowed by the Commissioner of Internal Revenue. The plaintiffs paid the total of those differences after tax deficiency assessments had been made and are now seeking refunds which amount to $108,438.00 plus interest.

Those differences stated in terms of percentage of total outstanding loans of each of the plaintiffs at the end of each tax year for which refunds on taxes are sought appear in the following columns:

| Years: | Ass'n | Ass'n % | Comm. % |
|---|---|---|---|
| 1952 | Mitchell-Huron | 2.617 | 1.393 |
| 1953 | Mitchell-Huron | 3.685 | 1.464 |
| 1954 | Mitchell-Huron | 4.094 | 1.195 |
| 1952 | N. W. South Dakota | 2.445 | 1. |
| 1953 | N. W. South Dakota | 3.312 | 1. |
| 1954 | N. W. South Dakota | 3.764 | 1. |
| 1952 | Pierre | 3.455 | 1.704 |
| 1953 | Pierre | 3.721 | .937 |
| 1954 | Pierre | 4.154 | 1. |
| 1951 | Rapid City | 1.301 | .208 |
| 1952 | Rapid City | 2.984 | .209 |
| 1953 | Rapid City | 3.314 | .344 |
| 1952 | Winner | 2.431 | 1.484 |
| 1953 | Winner | 2.195 | .994 |
| 1954 | Winner | 3.013 | .925 |
| 1952 | Watertown | 2.964 | 1.601 |
| 1954 | Watertown | 3.881 | 1.730 |
| 1951 | Yankton | 1.777 | .232 |
| 1952 | Yankton | 3.591 | .268 |
| 1954 | Yankton | 4.433 | .299 |
| 1954 | Aberdeen | 2.223 | 1. |

Statutes and treasury regulations involved and insofar as they are material on the questions arising under this record are the following ones:

Internal Revenue Code of 1939:

"§ 23 (as amended by Sec. 113(a), Revenue Act of 1943, c. 63, 58 Stat. 21). Deductions from gross income. In computing net income there shall be allowed as deductions:

\* \* \* \* \* \*

"(k)  *Bad debts.*

"(1)  *General rule.*—Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; \* \* \* [26 U.S.C. 1952 ed., Sec. 23.]"

Farm Credit Act of 1933, c. 98, 48 Stat. 257:

"Earnings Of Production Credit Associations

"Sec. 22. Each Production Credit Association shall, at the end of its fiscal year, apply the amount of its earnings in excess of operating expenses during such fiscal year, first, to making up any losses in excess of its reserve for bad and doubtful debts; second, to the restoration of the amount of the impairment, if any, of capital; third, *to the creation and maintenance of a reserve account for bad and doubtful debts, the amount of which account shall be prescribed by the Production Credit Corporation;* \* \* \* [Emphasis supplied.]"  12 U.S.C.A. § 1131f.

Treasury Regulations 118, promulgated under the Internal Revenue Code of 1939:

"Sec. 39.23(k)–5.  *Reserve for bad debts—*(a) *Taxpayer other than mutual savings banks, building and loan associations, and cooperative banks.*

"(1)  Taxpayers who have established the reserve method of treating bad debts and maintained proper reserve accounts for bad debts, or who, in accordance with § 39.23(k)–1, adopt the reserve method of treating bad debts, *may deduct from gross income a reasonable addition to a reserve for bad debts in lieu of a deduction for specific bad debt items.*  (Emphasis supplied.)

"(2)  What constitutes a reasonable addition to a reserve for bad debts must be determined in the light of the facts, and will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve. \* \* \* "

These statutes and regulations gave the plaintiff taxpayers the right to "deduct from gross income a reasonable addition to reserve for bad debts". They were required to add the amounts they did, and more, under recommendations or directions from the Production Credit Corporation of Omaha, which in view of the terms of the statute, carried the force of statutory mandate. Aside from those factors, there is evidence warranting their action in policies of a 5% reserve for bad debts, adherred to by other lending agencies, experiences of others suffering losses in depression periods following periods of higher prosperity levels and other evidence giving rise to an inference, that as they acted, they gave consideration to all relevant facts bearing on the problems they were required to solve.

The evidentiary phase, underlying the action of the plaintiffs as they made the additions to reserve for bad debts, based, as the court finds, on delegated statutory authority, on weight of acts performed in obedience to recommendations or orders or mandates from a federal supervising agency and on evidence as to conditions and circumstances which necessarily enter into such a security against losses problem, impresses this court as honest, prudent, wise, and determined efforts by their managers to provide against un-

certainties which because of violent ups and downs in the price structure, insects, and elements, *obtain in the agricultural financing field.*

A situation like, if not identical with this one was commented upon in the case of Rhode Island Hospital Trust Company v. Commissioner of Internal Revenue, 1 Cir., 1928, 29 F.2d 339, 342, where the court, as it asserted its views on the weight which should be given to acts of such kind, said:

"The stated grounds for the action of the executive officials of this bank in increasing their reserve for bad debts—and thus decreasing the showing of profits applicable to dividends—is highly persuasive, if not entirely conclusive. To characterize this clear and cogent statement of the grounds on which experienced bankers limited their profits in the interest of safety, as 'guesswork,' because reasonably anticipated losses were not ascertainable by mathematical calculation, is a position which this court declines to adopt. There is in this record no atmosphere of tax-dodging. While the honest judgment of bank officials as to the amount of profits made does not appear to be expressly made by statute prima facie evidence for profits-tax purposes, it is certainly, in the absence of any indication of a tax-dodging intent, to be given very substantial, if not controlling, weight. Plainly, such conservative action by officials, having obviously fully adequate motives to regard loans made by themselves as good, should not be lightly overruled by any governmental authorities. To hold, as the Board of Tax Appeals apparently did hold, that the evidence did not warrant the Commissioner in exercising discretion favorable to the bank's claim, because there was 'no evidence with respect to its experience as to losses over a period of years upon which a reasonable reserve might be predicated,' was, as matter of law,

wrong. Very few, if any, banks would, in the fall of 1921, have acted wisely if they had taken the 'experience as to losses over a period of years' as then a basis for a reserve for bad debts. Unusual conditions call for unusual measures. The Board of Tax Appeals in effect ruled that the unusual conditions of 1920–21 should be disregarded, and that this bank was entitled to make no increase in its reserve except on the basis of experience as to losses over a period of years. That was plainly error."

On the point of one federal supervising agency making recommendations, only to have them repudiated by another, the court in the case of United States v. Beckman, 3 Cir., 104 F.2d 260, 264, quoted with approval the statement made by Judge Northcott speaking for the Fourth Circuit Court of Appeals:

"Here we have a case in which one branch of the government can compel the taxpayer to take an action with regard to its securities which, when taken, will not be recognized by another branch of the government. This is not fair to the taxpayer. There should be at least some semblance of co-ordination between the several branches of the government in dealing with a taxpayer' ". Citing Citizens' National Bank of Orange v. Commissioner of Internal Revenue, 74 F.2d 604, 605, 110 A.L.R. 699.

■ All of that evidence, especially as it is viewed in the light of the rules ascribing to it the weight and force it should have, is compelling and conclusive on the question that the plaintiffs, as they made their additions to reserves for bad debts, acted and remained within the prescribed statutory limitation of "reasonable".

■ The Commissioner having made deductions from gross income, substantially lower than those of the plaintiffs, the question arises as to whether he abused his discretion. This court is convinced that he did, because of the rea-

sons assigned for the conclusions already reached; because of admissions of the author of the Commissioner's deduction findings, who testified that they were based on his own conclusions; that he did not look at a lot of the taxpayers' loans; that he did not know anything about security behind specific loans; that he gave no consideration to other audits of the taxpayers; that he disregarded past experiences of other lending agencies; that his conclusions in the main were bottomed on negligible losses had by the taxpayers since they were first organized and that he refused to recognize the loss experience of lenders, as a prosperity level falls.

Aside from such negatives there is in his table of deductions from gross income of each taxpayer, for each year—which are virtual constants—and in the admission in his brief, even though made for "purpose of uniformity", "that each taxpayer is entitled to accumulate a deductible reserve for bad debts equal to 1% of its outstanding loans", specific affirmative proof of disdain for relevant facts, operations under a rule of thumb, and a trampling, under shelter of "discretion", on taxpayers' rights. "Discretion", when chained to relevant facts, safeguards the taxpayers as it protects the government. Without such restriction, it can and must not be tolerated.

The conclusions reached in the case of Winter Garden Production Credit Ass'n v. Phinney, D.C., 139 F.Supp. 213, 216, virtually identical with the facts in these cases, is in complete harmony with the views herein expressed. Among other comments made by the court in that case, the following is of special significance:

"I am convinced that he did (abuse his discretion), and that the rate which the Commissioner determined is unduly low and unrealistic. I am convinced that this is so because the Commissioner's calculation does not take into account the highly significant fact that capable farm credit agencies suffered severe bad debt losses during the early 1930's; and the taxpayers here escaped this

fate by reason of the fact that they were organized during the height of the depression days and that, with negligible exception, the farmers economic condition has prospered and improved during the taxpayers' entire history."

This conclusion is in accord with the decisions having bearing on this point. As it is said in the case of United States v. Beckman, 3 Cir., 104 F.2d 260, 262, such discretion

" 'When invoked as a guide to judicial action it means a sound discretion, that is to say, a discretion exercised not arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result.' "

and in The First National Bank of Omaha v. Commissioner, 8 Cir., 49 F.2d 70, 72,

"It is not sufficient merely to declare a conclusion reasonable. There must be in the facts support for that conclusion."

Again, in Rhode Island Hospital Trust Co. v. Commissioner, supra:

"For present purposes, we assume that, if the Commissioner and the Board of Tax Appeals exercised their discretion, on legal and reasonable grounds, this court could not substitute its discretionary judgment for that of the tax authorities. *But if there was failure really to exercise discretion, or error of law in its exercise, then the court, must grant relief.* [Emphasis supplied.] Federal Trade Commission v. Pacific Paper [Trade] Ass'n, 273 U.S. 52, 63, 47 S.Ct. 255, 71 L.Ed. 534; Silberschein v. United States, 266 U.S. 221, 225, 45 S.Ct. 69, 69 L.Ed. 256."

and again, in Wigmore on Evidence, 3d ed., § 2491, relating to presumptions of law and of fact, it is said:

"Nevertheless, it must be kept in mind that the peculiar effect of a presumption 'of law' (that is, the

real presumption) is merely to invoke a rule of law compelling the jury to reach the conclusion *in the absence of evidence to the contrary* from the opponent. If the opponent *does* offer evidence to the contrary (sufficient to satisfy the judge's requirement of some evidence), the presumption disappears as a rule of law, and the case is in the jury's hands free from any rule."

Each of the plaintiffs is entitled to recover the amount which heretofore has been paid, with interest as claimed, in these cases.

Counsel for the plaintiffs will prepare findings of fact and conclusions of law in harmony with this decision.