## STEELE COUNTY BUILDING AND LOAN ASSOCIATION AND OTHERS v. COMMISSIONER OF TAXATION.

116 N. W. (2d) 506.

July 6, 1962—Nos. 38,363, 38,364, 38,365.

*Mackall, Crounse, Moore, Helmey & Holmes, Thomas P. Helmey,* and *Winston E. Munson,* for relators.

*Walter F. Mondale,* Attorney General, and *Jerome J. Sicora,* Special Assistant Attorney General, for respondent.

OTIS, JUSTICE.

These matters are before the court on writs of certiorari issued on January 16, 1961, consolidating for review decisions of the Board of Tax Appeals dated December 29, 1960, which sustained orders of the Commissioner of Taxation entered in September 1958.

The only issues for determination are whether the relator savings and loan associations in computing their Minnesota income taxes during various years from 1953 to 1956 were entitled to deduct an annual addition to reserves for bad debts, and, if so, whether the deductions were in reasonable amounts.

Relator Owatonna Savings and Loan Association (formerly Steele

County Building and Loan Association and hereafter referred to as "Owatonna Association") was incorporated under the laws of Minnesota in the year 1915, is regulated by the Commissioner of Banks, and is insured by the Federal Savings and Loan Insurance Corporation. For the taxable year 1955 the Owatonna Association deducted as an addition to its reserve for bad debts all of its net income after payment of dividends, in the sum of $40,455.61, which amount was disallowed by the Commissioner of Taxation who ordered an additional tax of $2,707.18.

Peoples Savings and Loan Association (formerly The Peoples Building and Loan Association of Albert Lea and hereafter referred to as "Peoples Association") was incorporated under the laws of Minnesota in the year 1905 and is under the supervision of the Commissioner of Banks, but is not insured with the Federal Savings and Loan Insurance Corporation. During the years 1953, 1954, 1955, and 1956, the Peoples Association added to its reserve for bad debts an amount equal to ½ of 1 percent of all of its mortgage balances at the end of the year. The amounts thus deducted were disallowed by the Commissioner of Taxation and additional taxes assessed each year as follows:

| Year | Deduction | Additional Tax |
| --- | --- | --- |
| 1953 | $10,000.00 | $ 593.40 |
| 1954 | 16,880.62 | 962.19 |
| 1955 | 23,815.70 | 1,595.65 |
| 1956 | 31,041.38 | 2,079.76 |

Pipestone Federal Savings and Loan Association (hereafter referred to as "Pipestone Association") was incorporated as a Minnesota corporation in the year 1919, now holds a Federal charter, is insured by the Federal Savings and Loan Insurance Corporation, and is under the supervision of the Federal Home Loan Bank. In the years 1955 and 1956, Pipestone Association deducted as an additional reserve for bad debts an amount equal to 3/10 of 1 percent of its share capital at the beginning of each taxable year. The amount of the deductions

disallowed by the commissioner and the additional taxes assessed are as follows:

| Year | Deduction | Additional Tax |
|------|-----------|----------------|
| 1955 | $16,070.86 | $1,076.76 |
| 1956 | 20,828.30 | 1,395.49 |

The statute governing the questions here raised during the years in question was Minn. St. 1957, § 290.09(5), which provided as follows:

"The following deductions from gross income shall be allowed in computing net income:

\* \* \* \* \*

"(5) Debts which become worthless during the taxable year, provided, that the taxpayer may in the alternative deduct a reasonable addition to a reserve for bad debts; provided further, that the commissioner may allow a bad debt to be deducted or charged off in part. Corporations taxable under the provisions of section 290.361 which have heretofore in any taxable year taken such deductions by the reserve method in their income tax returns to the Federal Government may, on or before July 1, 1949, make application to the commissioner for permission to take such deductions for the same year upon the same method."

During this period the Department of Taxation had in effect Regulation 2009(5) (b), 1955 Minnesota Income Tax Act and Regulations, which provided:

"A debt arising in the operation of a business and not because of a loan may be deducted for the taxable year in which it actually becomes worthless only if the amount thereof has been included in gross income for the taxable year in which the deduction is sought to be taken or in a prior taxable year. In this latter case, a taxpayer may, in the alternative deduct a reasonable addition to a reserve for a bad debt."

In 1959, Minn. St. 1957, § 290.09, was amended to add the following language (now part of Minn. St. 290.09, subd. 6[c]):

"\* \* \* and provided further that each savings, building and loan

association may take as a reasonable addition to reserve for bad debts such sums as are permitted to such associations for federal income tax purposes under section 593 of the Federal Internal Revenue Code of 1954, but the deductions by any such association for any one year shall not exceed 3/10 of one percent of the outstanding share capital as of the beginning of the taxable year or ten percent of the net earnings of such year, before the deduction of interest or dividends payable to its members, whichever is greater."

It is the contention of respondent Commissioner of Taxation that the statute in effect during the years in question and the regulations which then obtained prohibited deductions for additions to reserves for bad debts arising out of loans, that the 1959 amendment evidenced a legislative intention to change the then existing law; and that in the absence of any bad debt experience *any* deduction for additions to reserves is unreasonable.

While Federal savings and loan associations have been subject to Federal income tax since January 1, 1952, as a practical matter the relators have been permitted under Federal law to deduct their entire net income as a reserve for bad debts until such time as their surplus, reserves, and undivided profits equal 12 percent of their deposits or accounts.[1] Hence none of the relators has thus far paid a Federal income tax. Under the Minnesota income tax laws, savings and loan associations were exempt from 1933 to 1936 and again from 1939 to 1940 but were subject to tax in 1937 and 1938 and for all the years beginning with 1941. It does not appear that any deduction for bad debt reserves has been claimed by savings and loan associations prior to the year 1953. Prior to 1942 and subsequent to 1959, the regulations of the Commissioner of Taxation made no distinction between deductions for bad debt reserves made by taxpayers in the business of making loans and bad debt reserves taken by other taxpayers.

The Owatonna Association and Peoples Association, holding charters under Minnesota law, are required by Minn. St. 51.24 to accumulate a contingent or reserve fund by setting aside semiannually

---

[1] Internal Revenue Code of 1954, § 593 (68A Stat. 205, 26 USCA, § 593).

2 percent of their net earnings until the fund reaches 5 percent of accumulated capital or 50 percent of the book value of their real estate, whichever is greater, or in the case of the Owatonna Association, which is insured by the Federal Savings and Loan Insurance Corporation, whatever reserve is required by that agency if it is at least equal to the statutory minimum. The statute does not specify that the reserve is necessarily for bad debts.

These two associations are also governed by the regulations of the Commissioner of Banks. Since December 23, 1957, he has required that savings and loan associations holding Minnesota charters set aside annually a sum equal to 3/10 of 1 percent of their outstanding capital at the beginning of the year or 10 percent of their net earnings, whichever is greater, until their reserve fund for bad debts equals 12 percent of their capital. The Commissioner of Banks testified that in his opinion a reasonable reserve for bad debts would be 15 percent of the total assets, to be accumulated by an addition of 1 percent of assets annually.

In addition, the Owatonna Association and the Pipestone Association, being Federally insured, were required to create a reserve annually in the amount equal to 3/10 of 1 percent of their accounts at the beginning of the year until the fund equaled 2½ percent of all accounts after 13 years and 5 percent of all accounts after 20 years.[2]

The Pipestone Association holding a Federal charter is required to establish a reserve for losses equal to 10 percent of its capital by adding 5 percent of its net earnings semiannually, or whatever sum is directed by the Federal Savings and Loan Insurance Corporation, whichever is greater.

The vice president of the Owatonna Association testified that in his opinion a reasonable reserve for bad debts would be 12 to 15 percent of the share capital. The presidents of the other associations and the Commissioner of Banks were of the same opinion.

In its memorandum accompanying the decisions sustaining the orders

[2]Federal Savings and Loan Insurance Corporation Regulations, Part 163, 18 F. R. 7057, November 10, 1953.

of the Commissioner of Taxation and disallowing the deductions taken by relators, the Board of Tax Appeals laid great stress on the fact that the relators, having demonstrated no bad debt experience, could not show that a reserve in any amount was reasonable. The board pointed out that the commissioner had not permitted the use of the reserve method for losses resulting from *loans* except with respect to banks taxable under § 290.361.

The memorandum of the Board of Tax Appeals calls attention to the disparity in the deductions taken by the relator associations. If the formula authorized by § 290.09, subd. 6(c), is applied to each relator, it is obvious that the Owatonna Association has deducted proportionately more than four times as much for reserves as the Pipestone Association, and the Peoples Association has deducted proportionately about two and one-half times as much as the Pipestone Association.

In considering the Minnesota statute governing deductions for bad debts, and the various statutes and regulations, state and Federal, requiring reserves, it is essential to bear in mind that the income tax laws authorize reserves only for bad debts and not for other contingencies.

The principal reason for the absence of a bad debt experience by saving and loan associations is obvious. Defaults on mortgage notes result in foreclosures in which the mortgagees are invariably the only bidders at the sale. It is the practice under these circumstances for the mortgagee to purchase for the precise amount in default, with accrued interest and costs. The amount required to redeem is fixed by what the mortgagee pays at the foreclosure sale, and hence it is almost inconceivable that the mortgagee would bid at a figure lower than the amount of the default in order to enter a deficiency judgment against the mortgagor for the difference. Consequently, the number of bad debts which appear on the books is not an accurate reflection of actual conditions since they are nearly always converted into foreclosures. While the mortgagee may suffer an actual loss by redeeming real estate which ultimately may have less value than the amount of the loan foreclosed, the transaction results in a loss in the sale of real estate and not in a deductible bad debt. The bad debt record of these

relators is therefore distorted by the intervening foreclosure proceedings.

We are conscious of the effect to be given decisions of the Board of Tax Appeals and the weight this court must accord them. Under § 271.06, subd. 6, before the board, an order of the commissioner is prima facie valid. Section 271.10, subd. 1, defines our function thus:

"A review of any final order of the board of tax appeals may be had upon certiorari by the supreme court upon petition of any party to the proceedings before the board. Such review may be had on the ground that the board was without jurisdiction, that the order of the board was not justified by the evidence or was not in conformity with law, or that the board committed any other error of law."

Decisions of the Board of Tax Appeals are to be given the effect specified in § 271.11, as follows:

"In all cases determinable by order of the commissioner of taxation, the order of the commissioner, or in case of appeal therefrom, the order of the board of tax appeals or the decision of the supreme court, as the case may be, shall be prima facie evidence of all facts therein stated and shall be prima facie evidence that all precedent requirements of the law were complied with, and shall be prima facie valid, and such order or decision shall be conclusive as to all matters therein determined upon every appellant or petitioner for review and upon all parties to the proceedings who shall have so agreed, in writing, as herein provided."

Taxes assessed by the commissioner are presumed to be valid, and the taxpayer has the burden of showing their incorrectness or invalidity. § 290.48, subd. 8. With these statutory directions before us, it becomes our duty to construe Minn. St. 1957, § 290.09(5), to determine whether the taxpayers have sustained their burden of proving that the board's order was not justified by the evidence or in conformity with law. The commissioner argues that this section must be construed in the light of administrative interpretations pursuant to Minn. St. 645.16(8), and that his regulations must be given the effect of law under § 15.0413.

We are of the opinion that relators, as taxpayers defined in § 290.01, subd. 6, under the unambiguous language of the statute prior to 1959 were accorded the right to deduct a reasonable addition to reserves for bad debts, notwithstanding the commissioner's regulation to the contrary. It is not necessary to reach for a strained construction when the language of the statute is on its face free from doubt.[3]

While the commissioner argues that the 1959 amendment, expressly authorizing bad debt reserves for savings and loan associations, conclusively demonstrates the absence of authority so to do in prior years, we are of the opinion that an equally strong case may be made for finding that the amendment merely clarifies a prior legislative policy. A number of courts have held in a variety of circumstances that a statutory amendment may be deemed a construction of existing law. Stanford v. Butler, 142 Tex. 692, 700, 181 S. W. (2d) 269, 274, 153 A. L. R. 1054; General Petroleum Corp. v. Smith, 62 Ariz. 239, 157 P. (2d) 356, 158 A. L. R. 364; City of Hartford v. Town of Suffield, 137 Conn. 341, 77 A. (2d) 760; Hankenson v. Board of Education, 15 Ill. App. (2d) 440, 146 N. E. (2d) 194; Matter of Ehrlich, Inc. (Unit Frame Corp.) 5 N. Y. (2d) 275, 184 N. Y. S. (2d) 334, 157 N. E. (2d) 495, 71 A. L. R. (2d) 1115.

The rule with respect to administrative interpretation in Minnesota was stated in Sevcik v. Commr. of Taxation, 257 Minn. 92, 103, 100 N. W. (2d) 678, 686, as follows:

"While courts have respect for and give weight to departmental construction of statutes, it is not controlling, and while administrative construction of statutes of doubtful meaning may be persuasive, it does not preclude a different construction by the courts."

In determining what is a reasonable deduction for a bad debt reserve, we may look to the Federal decisions for guidance.[4] In Rhode Island Hospital Trust Co. v. Commr. of Int. Rev. (1 Cir.) 29 F. (2d)

---

[3]Minneapolis-St. Paul Sanitary Dist. v. City of St. Paul, 240 Minn. 434, 437, 61 N. W. (2d) 533, 535.

[4]State v. Stickney, 213 Minn. 89, 91, 5 N. W. (2d) 351, 352; Anderson v. Commr. of Taxation, 253 Minn. 528, 540, 93 N. W. (2d) 523, 532.

339, 341, the commissioner in refusing to allow a reserve for bad debts assigned as the reason:

"* * * There is no evidence with respect to its experience as to losses over a period of years, upon which a reasonable reserve might be predicated."

The Federal court held that such a ruling could not be sustained, stating that the previous precarious condition of the banking business called for precautions to prevent future failures, and that there was no justification for characterizing the opinions of bank officials as guesswork merely because anticipated losses could not be ascertained with mathematical certainty. The court noted (29 F. [2d] 342):

"* * * There is in this record no atmosphere of tax-dodging. * * * To hold, as the Board of Tax Appeals apparently did hold, that the evidence did not warrant the Commissioner in exercising discretion favorable to the bank's claim, because there was 'no evidence with respect to its experience as to losses over a period of years upon which a reasonable reserve might be predicated,' was, as matter of law, wrong."

The Rhode Island Hospital Trust case was followed in Mitchell-Huron Production Credit Assn. v. Welsh (D. S. D.) 163 F. Supp. 883. That decision in addition points out the injustice of a taxpayer's being compelled by one branch of government to take action, the necessity for which a different branch refuses to recognize, and stresses the need for some semblance of coordination. The Federal courts have distinguished between reserves for bad debts and for other types of losses in S. W. Coe & Co. v. Dallman (7 Cir.) 216 F. (2d) 566, and in American State Bank v. United States (E. D. Wis.) 176 F. Supp. 64. In the latter case the court held (176 F. Supp. 68):

"What constitutes a reasonable addition to a reserve, regardless of formula, depends upon the facts and circumstances of the business engaged in with relation to general business conditions. * * * The standard is whether the reserve itself is adequate to absorb the bad debts that might probably arise."

The commissioner in the instant case relies on Bellefontaine Federal Sav. & Loan Assn. v. Commr. of Int. Rev. 33 T. C. 808. In that decision the tax court said that since the taxpayers had made no charges against their reserve for bad debt losses during the years in question and the taxpayers' reserve already was substantial, no additions were "reasonable." In addition the court pointed out that reserves required by the Home Loan Bank Board were not merely for bad debts but to protect against other types of losses.

While it is true that not all of the reserves required by state and Federal regulatory bodies are for bad debts, we are of the opinion that the annual addition to reserves for bad debts included in the 1959 amendment to Minn. St. 1957, § 290.09(5) (now § 290.09, subd. 6), is in a reasonable amount and hold that relators are entitled to deduct from their Minnesota income taxes for the years here in question 3/10 of 1 percent of their outstanding share capital at the beginning of each taxable year or 10 percent of the net earnings, whichever is greater. Relators in their brief now seem to concede that the formula established by the 1959 amendment is a proper basis for deductions during the years in question.

Manifestly bad debt *experience* is one of the important considerations in establishing what is a reasonable deduction. However, we are not persuaded that it is either the exclusive criterion or that it is conclusive on the taxpayer. We subscribe to the views stated by the court in Sterling Production Credit Assn. v. United States, CCH, U. S. Tax Cases 61-1, par. 9292. There the court's conclusions of law included the following (p. 79,732):

"To ignore losses of country national banks making agricultural loans during the early 1930's would be to take an unrealistic guide for past experience as it would be unrealistic to take the disastrous losses of the 1930's as the only guide for past experience.

"The recommendations made by the supervisory federal agency as to reserves for bad debts are entitled to great weight in view of its long experience in the farm credit field, and the testimony of the officers and directors of the plaintiffs who have also had long experience in the farm credit field, are also entitled to considerable weight, but

such recommendations and determination in these cases are not conclusive."

Although relators weathered the depression of the 1930's, many of their competitors did not, and the testimony discloses a marked change in relators' potential exposure to a bad debt experience in the future. Whereas at one time relators' mortgage loans averaged $3,000 or $4,000, today their average loans exceed $10,000. Previously only about 50 percent of their mortgages were initially for the maximum amount the value of the property would bear, while today approximately 80 percent are for the maximum. In recent years the margin between the value of the property and the maximum amount of the mortgage has appreciably decreased. Savings and loan associations have become extremely competitive. Although they are closely supervised by Federal and state agencies, and the security of residential property is perhaps less speculative than that of commercial property, it would be highly imprudent to assume that the relatively prosperous business conditions which now obtain are destined to continue forever as a permanent way of life without any possibility of a recession. The legislature of Minnesota and the Congress of the United States have recognized the necessity for encouraging cautious and conservative policies in the operation of banking and savings and loan businesses, in which great numbers of persons have invested deposits. To take the position that no reserve for bad debts in any amount is justified requires a holding as a matter of law that all of relators' loans in the future will inevitably be repaid in full. This is an assurance and prognostication which no businessman is qualified to make, and one which certainly no court can underwrite. Accordingly the order of the Board of Tax Appeals is reversed. However, to the extent relators' deductions do not conform to the formula set forth in the 1959 amendment to § 290.09, the commissioner is authorized to levy additional assessments.

Reversed and remanded.

MR. JUSTICE ROGOSHESKE, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.