Commercial Capital Corporation, et al. 1 v. Commissioner. Commercial Capital Corp. v. CommissionerDocket Nos. 4098-65, 4213-65, 4214-65, 4308-65.United States Tax CourtT.C. Memo 1968-186; 1968 Tax Ct. Memo LEXIS 113; 27 T.C.M. (CCH) 897; T.C.M. (RIA) 68186; August 26, 1968. FILED Stephen L. Packard, *114 350 5th Ave., New York, N. Y., for the petitioners. John B. Murray, Jr., for the respondent. 898 FORRESTERMemorandum Findings of Fact and Opinion FORRESTER, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' income taxes as follows: Name of PetitionerDocketYear Ending19601961NumberCommercial Capital4098-65Aug. 31$41,599.59$30,611.61CorpRobert Yudin4213-65Dec. 311,111.55Morton Packard4214-65Dec. 311,187.24Jacob and Jenny4308-65Dec. 311,456.13FriedbergFor decision are the following issues: As Regards Commercial Capital Corporation Whether the corporation is entitled to deduct additions to its reserve for bad debts for the fiscal years ended August 31, 1960 and 1961. As Regards Commercial Capital Corporation and the Individual Petitioners Whether claimed gift, salesmen, and entertainment expenses are deductible to the corporation in full; and if not, whether any part of the nondeductible portion is taxable to the individual petitioners as a dividend for the year 1960. As Regards the Individual Petitioners Whether amounts received by the*115 individual petitioners pursuant to a "stock repurchase agreement" are taxable to them as ordinary income or as a capital gain. Findings of Fact Some of the facts are stipulated and are so found. Commercial Capital Corporation (hereinafter sometimes referred to as Commercial or, where applicable, petitioner) is a corporation under the laws of the State of New under the laws of the State of New York, having succeeded to its name after another corporation bearing the same name had liquidated. Its income tax returns for the fiscal years ended August 31, 1960, and 1961 were filed with the district director of internal revenue at Manhattan, New York. During these years the corporation was on an accrual basis method of accounting. Robert Yudin (hereinafter sometimes referred to as Robert, or, where applicable, petitioner), at the time the petition in this case was filed and at all relevant times resided in Flushing, New York. He and his wife, Lillian, filed their joint Federal income tax return for the calendar year 1960 with the district director of internal revenue at Brooklyn, New York. On respondent's motion, Lillian's petition has been dismissed for lack of jurisdiction. *116 Morton Packard (hereinafter referred to as Morton, or, where applicable, petitioner), at the time the petition in this case was filed and at all relevant times resided in New York City, New York. He and his wife, Rose, filed their joint income tax return for the calendar year 1960 with the district director of internal revenue at Manhattan, New York. Pursuant to respondent's motion Rose's petition has been dismissed for lack of jurisdiction. 2Jacob Friedberg (hereinafter sometimes referred to as Jacob) and Jenny Friedberg, husband and wife, at the time the petition in this case was filed and at all relevant times resided in New York City. They filed their joint income tax return for the calendar year 1960 with the district director of internal revenue at Manhattan, New York. Because Jenny Friedberg is a party in this case solely because she signed the joint return with her husband, references to petitioner in connection with the Friedbergs will refer only to Jacob. The individual petitioners, Robert, *117 Morton and Jacob, were on a cash basis method of accounting. During the years in issue they held stock in Commercial and were officers of the corporation. Facts Concerning Reserve for Bad Debts During the years in issue, Commercial was engaged in the business of financing accounts receivable and inventory. 899 This activity involved the making of direct loans to small business concerns, which loans were secured by either the accounts receivable or the inventory of the concerns. Approximately 75 percent of the loans during the instant period were secured by accounts receivable. Most of Commercial's customers were referred to it by brokers whose business it was to bring together businesses needing financing and lending organizations similar to Commercial. Generally the customers were in the toy and garment manufacturing business, were looking for immediate cash, and required a definite decision on their loan requests within 48 hours. Within that period of time, Commercial would obtain a Dun & Bradstreet report in order to determine the prospective client's rating. It would also examine a "Daily Litigation Bulletin" to determine if the company had any tax liens outstanding. *118 If a request for a loan were approved, the corporation would enter into an agreement with the customer which provided for loans based on a fixed percentage of the customer's accounts receivable. The difference between the face of the receivables and the amount loaned was considered to be a reserve for contingencies. If more than the fixed percentage were loaned, the account was considered to be over advanced. The contracts were for a period of one year, during which time a customer could not engage in similar financing with any organization other than Commercial. Amounts loaned were repaid when the client collected an account receivable or sold the inventory which was financed. Payments on accounts received by the client were forwarded directly to Commercial. During the period of the contract a client might increase his loan by assigning additional accounts receivable or inventory to Commercial without entering into an additional agreement. In return for its services, Commercial charged interest rates of 12 to 24 percent. Because it could not charge unincorporated enterprises as high an interest rate, its customers were all incorporated. In 1960 and 1961 Commercial had approximately*119 70 to 75 accounts. An auditor was employed on a full-time basis to examine the activities of each client. When a new account was being considered, the auditor performed a preliminary investigation resulting in the information discussed above. Approximately 10 to 12 accounts were added in both 1960 and 1961 after his investigation. After the initial investigation, the accounts were audited approximately once every 90 days, or once every 60 days for the larger accounts. The customer's accounts receivable were verified once a year by Commercial at the close of the fiscal period. They were not verified at any other time. Commercial computed its bad debt deductions on the reserve method. In computing the amount to be added to its reserve for bad debts each year it would first age all debtor accounts to determine which accounts appeared uncollectible. Any account more than 90 days overdue was considered uncollectible. The rest of the accounts were then evaluated in light of the collateral supporting them. In addition to evaluating the accounts themselves, the corporation also considered the prevalence of serious frauds in similar business, the fact that accounts were usually audited*120 only once every 90 days, and the fact that economic conditions in 1960 and 1961 were generally poor. After considering the above factors, the corporation determined the percentage of the accounts which were considered to be a proper reserve for bad debts, all the time remembering that the previous corporation bearing its name had underestimated its bad debts and had been forced out of business. Following is a summary of Commercial's provisions for bad debts and its bad debts experience for the fiscal years 1955 through 1966. The underscored years are the ones in issue: 900 Fiscal YearNotes andReserve for% of ReserveActual Bad% of-BeginningAccountsBad DebtstoDebts ChargedReceivablesReceivableat BeginningReceivablesAgainstof FiscalReserve (b)Period(a)9-1-54Not Given$ 68,238.63($24,919.35)9-1-55$2,038,899.0082,408.524.04(1,642.86).089-1-562,060,036.0098,289.904.77(3,181.18).159-1-572,453,429.00121,549.694.95 (6,376.28).259-1-582,591,308.00154,915.155.98(14,089.95).549-1-592,965,785.00184,049.776.21(1,868.92).069-1-603,724,456.00260,515.066.99(34,625.03).939-1-614,018,064.00277,699.756.91(24,206.00).609-1-624,881,156.00253,493.755.19(0).009-1-634,390,753.00260,075.005.92(5,768.00).139-1 -644,962,541.00285,000.005.74(9,259.00).195-1-654,331,082.00285,000.006.58(39,047.91).90*121 Fiscal YearAmounts Re-Add'n to Re-DateReserve forBeginningcoveredWhichserveDeductedBadDebts atHad Prev.Beenby Comm'lasEnd ofFiscalChgd.Bad DebtPeriodAgainstRe-Exp.at End of(e)(a+b+c+d)serveFiscalYear(addedback to(d)reserve)(c)9-1-54$39,089.248-31-55$ 82,408.529-1-5517,524.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,289.909-1-5626,440.978-31-57121,549.699-1-5739,741.748-31-58154,915.159-1-5843,224.578-31-59184,049.779-1-59$10,835.0067,499.218-31-60260,515.069-1-60441.2551,368.478-31-61277,699.759-1-6108-31-62253,493.759-1-626,581.008-31-63* 260,075.009-1-6330,693.008-31-64285,000.009-1 -649,259.004-30-65285,000.005-1-6539,047.914-30-66285,000.00 901 The above figures for accounts receivable represent the accounts receivable at the beginning and end of fiscal periods. The average accounts receivable outstanding at the end of each month for the fiscal years ending in 1960 and 1961 were*122 approximately 3 million and 3.5 million respectively. On its income tax returns for the fiscal years ended August 31, 1960, and 1961, Commercial deducted $67,499.21, and $51,368.47, respectively, for bad debt expenses. In 1962, Aaron Lerner, an internal revenue agent, examined Commercial's bad debt experience for the fiscal years ended August 31, 1955, through August 31, 1962. He concluded that the corporation's experience from 1955 through 1959 warranted no more than a reserve of 5 percent of the accounts receivable at August 31, 1960. Because the corporation's reserve prior to the $67,499.21 addition claimed by Commercial was in excess of 5 percent, he disallowed the addition to the reserve as a bad debt deduction for the fiscal year ended August 31, 1960. His conclusion was based solely on the fact that from 1955 through 1959 the corporation had a bad debt experience of less than 1/2 of 1 percent of the outstanding accounts receivable. The future experience of Commercial through the fiscal year ended August 31, 1962, confirmed his estimation. In his statutory notice of deficiency respondent disallowed the $67,499.21 amount deducted by Commercial as a bad debt expense for the*123 year ended August 31, 1960. This disallowance by respondent was not unreasonable. In 1964, Julius Miller, an internal revenue service agent, examined Commercial's bad debt experience for the fiscal years ended August 31, 1958, through August 31, 1962. He found that during this period the corporation had suffered bad debts of an average of less than one-half of 1 percent of its accounts receivable. He then concluded that as of August 31, 1961, a bad debt reserve of 4 percent of outstanding receivables was sufficient for the corporation. Because the reserve at August 31, 1961, after disallowance of the 1960 addition was more than 4 percent of the outstanding receivables, he determined that the corporation was not entitled to the additional $51,368.47 which it had deducted on its 1961 return. His examination of the corporation's experience from August 31, 1961, to August 31, 1962, confirmed his conclusion. In his statutory notice of deficiency, respondent disallowed the $51,368.47 amount deducted by the corporation as a bad debt expense. This disallowance by respondent was not unreasonable. Facts Concerning Salesmen and Entertainment Expenses Year Ended August 31, 1960 For the*124 year ended August 31, 1960, Commercial claimed a total of $36,714.84 in salesmen and entertainment expenses, of which respondent has allowed $24,214.84, and disallowed $12,500. The detail with respect to these items is reproduced below: Analysis of BusinessExpensesClaimedAllowedDisallowedTravel$ 4,497.45$ 4,497.45NoneEntertainment Expenses23,282.3911,982.39$11,300.00Salesmen Expenses8,935.007,735.001,200.00Total$36,714.84$24,214.84$12,500.00Entertainment Expenses Almost $1,800 of the claimed entertainment expenses represents amounts paid to a liquor store. Respondent allowed the entire amount as a deductible expense. Five thousand dollars of the disallowed entertainment expenses represents deferred expenses of the corporation for which credit was given for the year ended August 31, 1961, by respondent in his statutory notice of deficiency for that year. The correctness of this adjustment has been conceded by petitioner. The remainder of the disallowed entertainment expenses are in dispute. Following are the facts pertaining to the items involved. In December 1959, Commercial gave various brokers and clients*125 of the corporation cash and/or R.H. Macey department store gift certificates in $25 multiples. Six thousand dollars in gift certificates were purchased and distributed in December of that year. Of that amount, respondent determined that those individuals who were given $100 or less of the certificates were 902 given the gifts in the ordinary course of Commercial's business and allowed them as a deductible expense. Those individuals who received more than $100 were considered by respondent not to have received the gifts in the ordinary course of business and no amount given those individuals was allowed as a deductible expense. The individual gifts of $100 or less totaled $3,675, while the gifts of more than $100 totaled $2,750, as follows: 6 individuals received $250$1,5001 individual received $5005001 individual received $750750TOTAL$2,750Though the total $2,750 amount was determined nondeductible, respondent reduced that amount by $425 to reflect certificates purchased during the fiscal year ended August 31, 1959, but not distributed until the fiscal year ended August 31, 1960. Thus, of the gift certificates distributed in December 1959, $2,325*126 was disallowed as a deduction to Commercial and determined to be dividends paid on behalf of the individual petitioners in 1960. No evidence was presented by Commercial as to the necessity of giving gift certificates totaling more than $100 to any one individual. Commercial distributed $4,000 in cash as Christmas presents in 1959, after cashing checks for $3,000 and $1,000, respectively. One thousand dollars of this amount was given to 19 building employees, 5 letter carriers, 2 parcel-post carriers, and 7 employees of customers. This amount was allowed as a deductible expense by respondent. The remaining $3,000 was disallowed by respondent as being unsubstantiated and determined to be dividends paid on behalf of the individual petitioners. Other than the above facts, no evidence was presented with respect to the disallowed amount. Commercial also paid $6,501.01 to the Diners Club and other establishments during the year ended August 31, 1960. Of this amount respondent determined $5,526.01 was a reasonable, deductible business expense. The remaining $975 was not allowed as a deduction of the corporation and was further determined to be a dividend paid in respect of the individual*127 petitioners. No evidence was presented in regard to this expenditure other than the above facts. Salesmen's Expenses Of the $8,935 deducted by Commercial, respondent, for the year ended August 31, 1960, determined that $6,760 ($130 per week), represented reimbursement of the individual petitioners for auto expenses, tolls, gas, oil, garaging, home telephone for business use, and entertainment not charged directly via Diners Club and other restaurants. The remaining $2,175 was considered to be reimbursed expenses of Commercial's other employees. Respondent allowed the $2,175 figure as deductible in full. Of the $6,760 determined reimbursement of the individual petitioners, respondent allowed $5,560 as reasonable deductible expenses of Commercial. The remaining $1,200 was determined nondeductible expenses of Commercial representing a dividend paid in respect of the individual petitioners in the year 1960. The total disallowed expenses determined by respondent to be dividends paid with respect to the individual petitioners in 1960 amounts to $7,500 as follows: Gift Certificates$2,325.00Cash Gifts3,000.00Miscellaneous Entertainment Expenses975.00Salesmen Expenses1,200.00TOTAL$7,500.00*128 Respondent determined that this amount represented dividend income of $2,500 respectively to each petitioner for the 1960 calendar year. No portion of the $12,500 amount disallowed by respondent represents deductible expenses of Commercial for the year ended August 31, 1960. Of the $7,500 determined dividend income to the individual petitioners, $1,775 ($591.67 each) was dividend income to them in the year 1960. Year Ended August 31, 1961 For the year ended August 31, 1961, Commercial deducted $39,962.61 as salesmen and entertainment expenses. Of this amount, respondent disallowed $7,500 as follows: ClaimedAllowedDisallowedSalesmen Expenses$ 9,068.00$ 4,068.00$5,000.00Entertainment Expenses30,894.6128,394.612,500.00Total$39,962.61$32,462.61$7,500.00 903 The disallowed entertainment expenses of $2,500 consisted of corporate payments for trips to Florida by petitioners (its officers and shareholders) in the amount of $917.34, and the balance represented the personal use of three automobiles leased by Commercial and used by them. No evidence was introduced by either party in regard to the $5,000 salesmen expenses disallowed. *129 No portion of the $7,500 disallowed by respondent represented deductible expenses of Commercial for the year ended August 31, 1961. Facts Concerning Stock Repurchase Agreement In the early part of 1959, the Burry Corporation and Commercial entered into negotiations for a loan from Commercial of $315,000, in order that Burry could purchase a third corporation, Colonial Works, Inc. Negotiations broke off in late spring of that year when Commercial refused to loan Burry more than $285,000. About a month later, negotiations were resumed when the attorney for Burry, Eugene Corbet, suggested that the additional $30,000 be advanced by the individual petitioners, Robert, Jacob and Morton. As an inducement for the individuals' loans, Corbet said he would attempt to give them an equity position in Burry. This arrangement was agreeable in principle to the individual petitioners and negotiations continued. The loan arrangement was almost dropped a second time, however, when the parties had difficulty in agreeing on the respective parties' rights to the stock which was to be transferred to the individual petitioners. The Burry Corporation wanted the right to repurchase the stock at its*130 option, but the individual petitioners refused this request. On June 29, 1959, Commercial and Burry entered into an agreement covering the $285,000 loan from Commercial and the $30,000 loan from the individual petitioners. The agreement provided inter alia that Commercial was responsible for turning over the full $315,000 on the day of closing. Compensation from Burry was to be at the rate of 1/22 of 1 percent of the daily cash balance outstanding. Repayments to Commercial were to be at the rate of $5,000 per month. As regards the transfer of Burry shares to the individual petitioners, the agreement read as follows: SIXTH: Burry has been advised that the Lender will make an advance of Two Hundred Eighty-five Thousand Dollars ($285,000.00) of its own funds and that its designee may participate in advancing an additional sum of Thirty Thousand Dollars ($30,000.00) This in no wise is to affect the obligation to advance to Burry certified check in the sum of Three Hundred Fifteen Thousand Dollars ($315,000.00), as hereinabove mentioned. As an inducement to the designee of the Lender to advance the additional sum of Thirty Thousand Dollars ($30,000.00), Burry or John Burry, individually, *131 agree to sell 3 transfer to the designee of the Lender an amount of stock which will then be ten percent (10%) of the issued and outstanding stock of The Burry Corporation, which 3 or Burry will issue an amount of stock which will be equivalent, when said stock is issued, to ten percent (10%) of the outstanding shares. If necessary, Burry shall be permitted to amend its certificate of incorporation to effectuate the issuance of this stock. Burry and/or John Burry, individually, obligate themselves to repurchase the stock referred to in this paragraph "SIXTH" at a price of Thirty-one Thousand Five Hundred Dollars ($31,500.00), payable as follows: (a) Commencing July 1, 1960, Six Thousand Three Hundred Dollars ($6,300.00) per annum in equal monthly instalments on the first day of each and every month until the full sum of Thirty-one Thousand Five Hundred Dollars ($31,500.00) shall have been paid. (b) Burry and/or John Burry, individually, shall have the iight to anticipate the payment of the purchase price. (c) While there is still a balance outstanding, Burry and/or John Burry, individually, guarantee*132 payment to the designee or designees aggregately the sum of Three Thousand Dollars ($3,000.00) per annum, payable in equal monthly instalments on the first day of each and every month commencing August 1, 1959. The word "transferred" was substituted for the word "sell," because the parties did not intend to have any price paid for the stock. The agreement further provided that Burry could elect to demand a reduced loan of $250,000 and thus eliminate the "stock purchase transaction," stating: SEVENTH: At the option of Burry (to be exercised by Burry on or before 7/6/59 by Burry giving notice to Lender by certified mail) 904 it shall have the right to elect to demand a reduced loan of Two Hundred Fifty Thousand Dollars ($250,000.00), in which event the stock purchase transaction previously referred to herein shall be null and void and eliminated. If the $250,000 loan was demanded, however, the interest rate was to be increased from 1/22 of 1 percent daily to 1/20 of 1 percent daily. On July 15, 1959, Commercial loaned Burry the sum of $315,000 and received a note back in that amount containing terms consistent with those of the June 29, 1959, agreement. Of the $315,000*133 paid, Commercial actually paid $285,000 and the remaining $30,000 was paid by Robert, Morton and Jacob in equal amounts of $10,000 each. Pursuant to the agreement, one certificate for five shares of Burry Corporation stock (an amount equal to 10 percent of the outstanding stock of the company) was transferred to the individual petitioners in their names. In June 1960, Jacob phoned the Burry Corporation (renamed Burry-Colonial Corporation after the loan) and notified it that the corporation should commence making payments in accordance with their agreement. Pursuant to the provisions of the repurchase agreement, Burry paid to the individual petitioners a total of $3,150 in 1960. In 1963, Burry, in connection with a Small Business Association loan terminated the loan and repurchase agreement, paying the balance of the loan outstanding and a settlement amount of $10,250 for the remaining balance on the "stock repurchase agreement." The stock certificate was then turned over to the attorney representing Burry. On their individual income tax returns for the calendar year 1960, Robert, Jacob and Morton each reported a long-term capital gain on Burry-Colonial stock of $1,050 (1/3 of*134 the $3,150 amount paid in 1960 by Burry). The entire amount received by each was shown as a capital gain of [on] the full amount because each considered his basis in the stock to be zero. Respondent, in his statutory notices, disallowed the capital gains treatment, determining that the $1,050 amounts reported were to be taxed in full as ordinary income. The "stock repurchase agreement" was in fact a security device to guarantee payment of $31,500 in addition to the $30,000 repayment of the individual petitioner's loans. The amounts paid pursuant to the "repurchase agreement" were interest payments taxable in full as ordinary income. Opinion Reserve for Bad Debts Issue Petitioner, Commercial Capital Corporation, contends that under section 166(c) of the Internal Revenue Code, 4 it is entitled to deduct additions to its reserve for bad debt account in the amounts of $67,499.21 and $51,368.47, respectively, for the fiscal years ended August 31, 1960, and 1961. Respondent has disallowed the additions for both years and petitioner contests the full amount disallowed. *135 The ultimate question is whether Commercial's reserve at August 31 of each year was adequate to cover the accounts receivable which could reasonably be expected to become worthless. If the reserve was adequate without any addition, then no amount is allowable as a deduction for an addition to the reserve in those years. Roanoke Vending Exchange, Inc. 40 T.C. 735 (1963). The question is one of fact to be decided on the basis of the evidence presented. Because the statute vests discretion in the Commissioner of Internal Revenue to determine the reasonableness of the addition to the reserve, Commercial has two burdens to meet before it may prevail. It must not only demonstrate that its additions to the reserve were reasonable, but must also show that respondent's action is disallowing the additions for the years in question was arbitrary and amounted to an abuse of his discretion. Roanoke, supra, p. 741. The level of the burden on the taxpayer is thus much greater than that which he usually must meet. Roanoke, supra. Petitioner argues that because respondent's agents did no more than examine Commercial's bad debt history both before and after the years in question, *136 respondent was acting unreasonably in disallowing 905 petitioner's addition to its reserve account. It also points out, as shown by our findings of fact, that its calculation of a reasonable reserve involved a more detailed analysis of the relevant factors than did respondent's. The reasonableness of the reserve calculated by petitioner's officers was attested to by Harold Feldman, vice-president of financial affairs at Farleigh Dickinson University, an expert in management and securities analysis. It was his opinion that for a business similar to petitioner's, a calculation of approximately a 7 percent reserve was within the minimum which it should have, considering that the economy during the time the reserves were computed was undergoing a recession. He further testified that in his opinion a reserve in the range of the 4 to 5 percent amount determined by respondent was at best marginal, stating that a history of small bad debts in petitioner's type of business was not significant due to the high risk involved. However, he was not familiar with any specific accounts of petitioner. Though we give great weight to the testimony petitioner presented, Rhode Island Hospital T. Co. v. Commissioner, 29 F. 2d 339*137 (C.A. 1, 1928), (reversing 8 B.T.A. 555, but cited by us in Mill Factors Corp., 14 T.C. 1366 (1950)), we find that it is insufficient to meet the standard required to overcome respondent's determination. As stated above, the test is not which approach (petitioner's or respondent's) is philosophically more accurate, but whether respondent abused his discretion in disallowing the taxpayer's method. United States v. Haskel Engineering & Supply Co., 380 F. 2d 786 (C.A. 9, 1967); Ehlen v. United States, 323 F. 2d 535 (Ct. Cl. 1963); Paramount Finance Co. v. United States, 304 F. 2d 460 (Ct. Cl. 1962). The respondent has not abused his discretion unless it can be shown that his determination did not reasonably allow for the debts which could actually, during the year in issue, be expected to go bad. Failure of respondent to allow for mere contingencies is not an abuse of his discretion. Financial Credit Corp. v. United States, 205 F. Supp. 274 (D. Idaho, 1962); S.W. Coe & Co. v. Dallman, 216 F. 2d 566 (C.A. 7, 1954). Respondent's use of a taxpayer's bad debt history as the sole basis for*138 respondent's determination has been upheld on numerous occasions where the taxpayer's bad debt experience actually turned out to be no greater than that allowed for by respondent. An often cited case upholding such a procedure is the decision of this Court in Black Motor Co., 41 B.T.A. 300 (1940), (affirmed on other issues, 125 F. 2d 977, C.A. 6, 1942). In that case respondent determined that the taxpayer's reasonable reserve for bad debts was a percentage of its accounts receivable no greater than its average percentage of bad debts over the previous six-year period. Though we noted that the taxpayer's bad debt history was not the sole criteria which could be used in computing reasonable reserve, we could not find that respondent's method was unreasonable, especially when subsequent events confirmed respondent's determination. Certainly under some circumstances reliance solely on a taxpayer's bad debt experience is unreasonable and a number of cases have so held. Situations such as a severe economic depression affecting a certain industry, Rhode Island Hospital T. Co., supra, a relatively short period of time in business or a recent change*139 in a business' activities, Apex Brewing Co., 40 B.T.A. 1110 (1939), specific accounts which probably will not be collectible, Duffey v. Lethert, an unreported case ( D. Minn. 1963, 11 A.F.T.R. 2d 1317,, or in fact a bad debt experience similar to that foreseen by the taxpayer, Winter Garden Production Credit Ass'n v. Phinney, 139 F. Supp. 213 (S.D. Tex. 1955), have been held to be sufficient to render the taxpayer's history meaningless and respondent's sole reliance on same unreasonable. In the instant case, there are no such circumstances. No substantial evidence was introduced to show that the economic conditions were so severe or the financial stability of any account so weakened that it was reasonably certain that bad debts greater than those allowed for by respondent would be incurred. In addition there was no year from 1953 through 1965 where petitioner's bad debt experience was more than 1 percent of the total accounts receivable at the end of a fiscal period. Petitioner stresses the fact that respondent's agent did not give consideration to the financial condition of those to whom Commercial loaned money or their credit rating, *140 the condition of the collateral upon which the loans were based, the conditions prevailing in the accounts receivable 906 financing industry, the general economic conditions exsting in the United States at the time the addition to the reserve for bad debts was made by Commercial, or the size of the individual accounts. But a showing of respondent's failures of examination is not sufficient in itself to show that his determination was unreasonable. To show that respondent abused his discretion by not examining petitioner's accounts, petitioner would have to show the existence of certain doubtful accounts which necessitated a higher adjustment. Maverick-Clarke Litho Co., 11 T.C. 1087, affd. 180 F. 2d 587 (C.A. 5, 1950); Mill Factors Corp., supra.No such evidence was introduced. Similarly if respondent's refusal to examine economic conditions pertaining to the country or the petitioner's business was an abuse of his discretion, petitioner would have to show that consideration of same would have required a greater reserve than that determined. *141 Petitioner's mere citation of the existence of a general recession without pin-pointing a showing of specific accounts of petitioner which were jeopardized by it is insufficient. In deference to petitioner's position we have considered the decisions in Mitchell-Huron Production Credit Ass'n v. Welsh, 163 F. Supp. 883 (D. S. Dak., 1958), and Haskel Engineering & Supply Co. v. Commissioner, an unreported case ( D. Cal. 1966, 17 A.F.T.R. 2d 861,. Both cases do appear to hold that where the taxpayer has made a reasonable allowance for bad debts while the Commissioner has based his determination solely on the taxpayer's bad debt history, the Commissioner's determination is in effect unreasonable per se. We do not, however, feel that these cases represent the applicable standard to be applied in this area. Shortly after the briefs were filed in this case, the Haskel Engineering decision was reversed by the Ninth Circuit in United States v. Haskel Engineering & Supply Co., 380 F. 2d 786. The Mitchell-Huron case has been restricted to its peculiar facts by the Court of Claims in Ehlen v. United States, supra, and we do the same in*142 the instant case. The better view in our opinion is illustrated in Patterson v. Pizitz, Inc., 353 F. 2d 267 (C.A. 5, 1965), a case involving the year ended January 31, 1960. In that case the Commissioner determined that the taxpayer's reserve for bad debts was adequate as of January 31, 1960, and disallowed the addition to the reserve deducted by the taxpayer solely on the basis of the taxpayer's past experience. In holding that the evidence was not sufficient for the issue of the reasonableness of the Commissioner's determination to be presented to a jury, the Fifth Circuit stated (pp. 269-270): We begin then with the fact that the amount of the receivables and the bad debt losses remained relatively stable or constant throughout the five year period of 1956-1960, and that the bad debt reserve as of the end of the 1960 fiscal year was more than twice what might be anticipated by way of bad debt losses based on the experience during the five year period. As against this the taxpayer offered the following evidence to show the requisite abuse. The testimony of its accountant was that a reserve of six per cent of accounts receivable was necessary, and that the Commissioner*143 had allowed the use of the six per cent formula as described throughout the period of five years. There was evidence that delinquencies were increasing as were the type of accounts which were more susceptible to becoming delinquent. There was proof that recoveries on charge offs would have been decreased had legal expenses incurred in the process of recovery been deducted from the recoveries rather than as a general operating expense. * * * There was some evidence that economic conditions in the Birmingham area were on the down grade beginning in 1957. Automation was a problem and the work force in the area had decreased from a high of 210,850 in June of 1957 to an average of 196,600 for 1959. Strikes were also a problem. Moreover, taxpayer relied on the fact that its credit policy was liberalized in 1958 but subsequent experience did not support its contention that substantially more losses would result. Considering the evidence on balance, we find that it does not rise to that level of proof which would show an abuse of discretion on the part of the Commissioner. * * * In the instant case, the evidence before us is at best at no higher level than that before the court in Patterson. *144 There are no more grounds here than there were in that case to hold respondent's determination unreasonable and, like that court, we find for respondent on this issue. Also cf. Financial Credit Corp. v. United States, 205 F. Supp. 274 (D. Idaho, 1962); Maverick-Clarke Litho Co. v. Commissioner, supra; Mill Factors Corp., supra, and Ehlen v. United States, supra.907 Salesmen, Christmas Gifts, Entertainment Expense Issue Of the $12,500 amount disallowed by respondent for salesmen, gift, and entertainment expenses for the year ended August 31, 1960, and $7,500 for the year ended August 31, 1961, Commercial concedes only that respondent was correct in determining that $5,000 in gift certificates deducted in 1960 should have been deducted the following year. It contends that the remaining amounts were incurred as ordinary and necessary expenses of the business. The only evidence presented by Commercial in its favor pertaining to these items was that of petitioner Robert Yudin to the effect that the Christmas gifts given in 1959 were to brokers and clients and were necessary to obtain new business and maintain efficient controls over*145 outstanding loans. He gave no details as to the disallowed $3,000 in cash gifts (December 1959) nor did he say why certain individuals required gift certificates totaling $250, $500, or $750, while all others received $100 or less. Such large gifts require a more detailed explanation as to their necessity. Consequently, because of the paucity of the evidence on these items disallowed by respondent, we uphold his determination as to the full $12,500 and $7,500 amounts disallowed to the corporation for the years ended August 31, 1960, and 1961, respectively. Cf. Walker v. Commissioner, 362 F. 2d 140 (C.A. 7, 1966), affirming a Memorandum Opinion of this Court. Of the $12,500 amount disallowed for the year ended August 31. 1960, respondent has determined that $7,500 represents dividend income in the amount of $2,500 each to the individual petitioners for the calendar year 1960. In the absence of evidence to the contrary, we uphold respondent's determinations that the payments were dividends to the individual petitioners. Challenge Manufacturing Co., 37 T.C. 650 (1962). Petitioners correctly point out, however, that our jurisdiction is limited to determining*146 dividend income for the calendar year 1960, as that is the only year before us with respect to them. Further, they contend that the evidence shows that the receipt of the dividends took place in part in 1959. We agree with petitioners. The law is clear that a cash basis taxpayer recognizes the receipt of income only in the year in which that income is received. Section 1.446-1(c)(1)(i) and section 1.451-1(a), Income Tax Regs.; Healy v. Commissioner, 345 U.S. 278 (1953); Estate of Henry Miller, 42 T.C. 593 (1964). The only evidence concerning these expenses consists of a joint exhibit, prepared by respondent, which summarizes those expenses of Commercial which respondent considered nondeductible for the year ended August 31, 1960. Of the $12,500 considered nondeductible, $5,000 is shown to be a deferred expense as discussed above, and not considered dividend income to petitioners. The remaining $7,500 represents the amount determined to be dividend income to the petitioners for the calendar year 1960. This amount is broken down as follows: *147 Two thousand three hundred twenty-five dollars represents nondeductible expenses for the R.H. Macey gift certificates discussed above. These expenses are specifically shown by the exhibit to have been paid in 1959 and we have found that they were paid in that year. We further hold that because they were paid in 1959 they were not dividends constructively or in any other manner received in 1960. Three thousand dollars represents the nondeductible cash Christmas gifts paid in 1959. We again hold that they were not constructive dividends in 1960 for the same reason. One thousand two hundred dollars represents nondeductible amounts which were considered paid to reimburse the individual petitioners for expenses incurred. Respondent determined that the total reimbursement was $130 per week for the 52 weeks ending August 31, 1960, or $6,760. Of this amount he allowed $5,560 as reasonable and disallowed $1,200 as unsubstantiated. Respondent's method indicates and we find that the $1,200 disallowed was spread evenly over the 52-week period at a rate of $100 per month. Because four months during this period fell in 1959, we find that only $800 of the disallowed expenses represented dividend*148 income to petitioners in 1960. Nine hundred seventy-five dollars represents nondeductible amounts paid to the Diners Club by Commercial. The total paid to the Diners Club was $6,501.01. However, unlike the reimbursed expenses discussed above, there is no indication as to when the disallowed amounts were paid. Neither is there any indication as to how 908 the nondeductible portion was computed. In the absence of such information, we find that the presumed correctness of respondent's determination has not been overcome by the information in the exhibits and thus find that the entire amount disallowed represents dividend income to the individual petitioners in 1960. We uphold respondent's determination that the amounts paid by Commercial to the individual petitioners in 1960 represents dividend income to them in equal amounts. However, because we find after the above adjustments, that the total constructive dividends paid in 1960 were $1,775, rather than $7,500, we find that the individual petitioners, Robert, Jacob and Morton received additional dividend income in 1960 in the amount of $591.67 each, rather than the $2,500 amount determined by respondent. Stock Repurchase Issue*149 During the calendar year 1960, each individual petitioner received $1,050 pursuant to the so-called "stock repurchase agreement" set forth in the findings of fact. Petitioners contend that under said agreement they had obtained stock in Burry Corporation and a put to resell it at a future date; that when they exercised the put more than six months later, they were entitled to treat their gain on the transaction as a longterm capital gain under sections 1221 and 1233(c) of the Code. Petitioners concede that their basis in the stock was zero. Respondent's position is that the stock of Burry Corporation was not substantively received by Commercial with a put to resell same, but was received by the Corporation as security for a $31,500 interest payment to be made on a $30,000 loan to Burry by the petitioners, and that consequently, amounts received by the petitioners were interest. The provisions of the agreement refer to a stock transfer and repurchase obligation, but not at petitioners' option. A security arrangment is not spelled out, but we are not bound by the words used, if in fact a security arrangement is what actually took place. It is the substance of the agreement, *150 not its form, which controls. Victor G. Mushro, 50 T.C. 43, 50; Patton v. Jonas, 249 F. 2d 375 (C.A. 7, 1957); and see Olin Bryant, 46 T.C. 848. The testimony of the individual petitioners and the attorney for Burry Corporation was that the parties intended that the stock was to be transferred to the individual petitioners absolutely; that Burry and/or John Burry (hereinafter referred to as the Burrys) wanted the right to repurchase the stock, but finally acquiesced to not having any such provision in the agreement; that the Burrys were obligated to repurchase the stock at a fixed price, but only at the discretion of the individual petitioners; and that the stock eventually was resold to the Burrys, but only because the petitioners wanted to resell, not because of any requirements of the agreement. The portion of the agreement referring to the stock retransfer provisions is in paragraph "Sixth" set forth in the findings of fact, and reads as follows: Burry and/or John Burry, individually, obligate themselves to repurchase the stock referred to in this paragraph "SIXTH" at a price of Thirty-one Thousand Five Hundred Dollars ($31,500.00), *151 payable as follows: (a) Commencing July 1, 1960, Six-Thousand Three Hundred Dollars ($6,300.00) per annum in equal monthly instalments on the first day of each and every month until the full sum of Thirty-one Thousand Five Hundred Dollars ($31,500.00) shall have been paid. (b) Burry and/or John Burry, individually, shall have the right to anticipate the payment of the purchase price. (c) While there is still a balance outstanding, Burry and/or John Burry, individually, guarantee payment to the designee or designees aggregately the sum of Three Thousand Dollars ($3,000.00) per annum, payable in equal monthly instalments on the first day of each and every month commencing August 1, 1959. Though in form the "repurchase agreement" is mandatory on both parties, petitioners contend that in fact it is only mandatory on the Burrys. Their explanation is that it is implied that they had an option to require "repurchase" (a put), even though no words giving them this privilege were used in the agreement. Though the agreement sets a fixed schedule of payments, allowing at the same time for the Burrys to anticipate the purchase price, petitioners insist that there is a further implication*152 that those provisions could come into play only after they gave notice of their intent to require "repurchase" they point out that the "repurchase" payments were not to begin until July 1, 1960, apparently contending that this period of delay 909 represented the option period, and that until that time the Burrys were under no obligation for any amount. Section (c) of paragraph Sixth, however, refutes petitioners' proffered interpretation that no amount was owed them until July 1, 1960. That section indicates that an obligation for the $31,500 amount would come into existence no later than August 1, 1959, because at that time the payments provided for by said section (c) were to commence and thereafter continue while any part of the $31,500 balance remained unpaid. Despite petitioner's attempt to attribute section (c)'s reference to "balance outstanding" to the $315,000 loan, the organization of that section leaves no doubt that the term "balance outstanding" refers to the $31,500 amount to be paid for the Burry stock. It follows that because payments were to be made while a balance was outstanding, commencing August 1, 1959, the $31,500 amount was not a debt of the Burrys*153 only at petitioners' option. It was a debt of the Burrys absolutely no later than August 1, 1959, and we find and hold that a debt of $31,500 existed at the time the loan agreement was closed on July 15, 1959, with payments thereon to begin on July 1, 1960. The testimony presented was to the effect that the parties had difficulty in entering into an agreement because each side wanted an option as to purchase and sale of the shares. Despite petitioners' contention, the terms of the agreement show that the compromise was to give neither party an option. The compromise was that the shares were to be retransferred at a fixed price and a fixed date no matter what the subsequent desires of either party. If the parties had intended that the individual petitioners were to have an option (a put), they undoubtedly would not have left such an important, hard-fought provision to the implications which petitioners would have us find. As is shown in the findings of fact, under paragraph "Seventh," where Burry had an option to demand a reduced loan, the word "option" was used. If the parties had intended for petitioners to have an option under paragraph "Sixth," we have no doubt that the word*154 "option" would have been used there also. The governing factor in whether a transaction represents a sale or a security arrangement is the intention of the parties and this is to be gathered from all the attending facts and circumstances, not only from the instruments themselves. Victor G. Mushro, supra; Olin Bryant, supra; United National Corp., 33 B.T.A. 790 (1935); Patton v. Jonas, supra. Having found that the stock transferred to the individual petitioners was to be returned to the Burrys, we find that the stock transaction was in the form of a security arrangement, as contended by respondent, and not a sale accompanied by a put, subsequently exercised, as contended by the individual petitioners. The petitioners were required to resell the stock to the Burrys at a fixed price. The dates and the amounts of the payments were fixed by the agreement. In effect the individual taxpayers had no more rights in the Burry stock than the ordinary pledgee. They were owed $31,500 as consideration for a loan by them of $30,000. Until the*155 $31,500 was paid they had the right to hold the stock in the Burry Corporation. The fact that they actually did receive payment and did return the stock to Burry confirms that this was the situation. As was stated in Patton v. Jonas, supra (at 378): We think that, when the extraneous matters which tend to cloud the issues before us are brushed aside, the transaction in question is nothing more than a typical secured loan arrangement, whereby only the ordinary debtor-creditor relationship was created. This conclusion is based on a slight variation of the familiar maxim that where a deed, absolute on its face, is coupled with an agreement to reconvey upon payment of a stipulated sum, the transaction is nothing more than a mortgage. * * * The amounts determined received by the individual petitioners were consideration for the $30,000 advanced to Burry. Such consideration is interest and is taxable in full as ordinary income. Cf. Green v. Commissioner, 367 F. 2d 823 (C.A. 7, 1966), affirming a Memorandum Opinion of this Court. United National Corp., supra. A Rule 50 computation in respect to the individual petitioners is required. Respondent*156 has indicated that a Rule 50 computation is also necessary in regard to Commercial, though we have upheld his determination on all disputed points. Therefore, to give the parties the opportunity to reconcile our decision with their agreements, in all of the dockets, Decision will be entered under Rule 50. 910 Footnotes1. Cases of the following petitioners are consolidated herewith: Robert Yudin, docket No. 4213-65; Morton Packard, docket No. 4214-65; and Jacob Friedberg and Jenny Friedberg, docket No. 4308-65.↩2. Rose Packard died prior to the issuance of the statutory notice. The petition as to her was dismissed for lack of proper verification by representatives of her estate.↩*. Actually totals $260,074.75 - the discrepancy is not explained, though the parties have agreed to the above figure.↩3. The words "sell" and "which" are handwritten, and then lined out.↩4. All references refer to Internal Revenue Code of 1954. SEC. 166. BAD DEBTS. * * * (c) Reserve for Bad Debts. - In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.↩